SHAWL v SPENCE BROTHERS, INC

Docket No. 275271. Submitted May 7, 2008, at Lansing. Decided August 19, 2008, at 9:00 a.m. Leave to appeal sought.

James R. and Mary B. Shawl brought an action against Spence Brothers, Inc., and J. Ranck Electric, Inc., seeking damages for injuries James Shawl suffered when an electrical panel under the control of J. Ranck Electric fell on his back while he was working for a subcontractor of Spence Brothers. Spence Brothers forwarded the Shawls' complaint to its insurer, Amerisure, but Amerisure failed to timely answer the complaint, despite having been granted a 30-day extension by the Shawls' attorney. As a result, the court, William A. Crane, J., entered a default against Spence Brothers. Spence Brothers moved to set aside the default on the ground that the extension to which the parties had agreed changed the deadline to August 14, 2006, rather than August 8, 2006; however, because no answer had been filed by August 14, the trial court denied the motion, and also denied a motion for reconsideration. Spence Brothers appealed.

The Court of Appeals *held*:

1. The trial court's decision on the motion to set aside the default is reviewed for an abuse of discretion, not de novo, because, although the court initially referred to a good-faith standard rather than the standard requiring good cause and a meritorious defense that is set forth in the court rule, the court ultimately applied the correct standard. Accordingly, there are no issues of law regarding the application of the rule presented in this case.

2. The negligence of an insurer or its intermediaries should not be presumptively imputed to an insured, procedurally nonnegligent defendant to preclude a finding of good cause and excusable neglect in connection with a motion to set aside a default. A defendant who diligently turns over a case to an ultimately negligent insurer should not be denied his or her day in court, and should not be obligated to inquire whether the insurer did what it had contracted and accepted a premium to do. Accordingly, Amerisure's negligence in failing to answer the complaint should not be imputed to Spence Brothers, and it constitutes a reasonable excuse, under the good-cause test, to set aside the default.

3. A general contractor is only liable for a subcontractor's negligence in situations where the general contractor failed to take reasonable steps within its supervisory and coordinating authority to protect workers from readily observable, avoidable dangers in common work areas that create a high degree of risk to a significant number of workers. Accordingly, Spence Brothers established the existence of a meritorious defense by asserting that any danger created by the allegedly faulty electrical panel was not readily observable and affected only a small number of workers.

4. Because Spence Brothers has satisfied the requirements of showing good cause and a meritorious defense, permitting the default to stand, by following a rule that would perfunctorily impute Amerisure's negligence to Spence Brothers, would result in manifest injustice.

5. In determining whether a party has established good cause to justify setting aside a default judgment, the trial court should consider the totality of the circumstances, including the following factors: (1) whether the party completely failed to respond or simply missed the deadline to file; (2) if the party simply missed the deadline to file, how long after the deadline the filing occurred; (3) the duration between entry of the default judgment and the filing of the motion to set aside the judgment; (4) whether there was defective process or notice; (5) the circumstances behind the failure to file or file timely; (6) whether the failure was knowing or intentional; (7) the size of the judgment and the amount of costs due under MCR 2.603(D)(4); (8) whether the default judgment results in an ongoing liability (as with paternity or child support); and (9) if an insurer is involved, whether internal policies of the company were followed. This list is not exhaustive or exclusive, and the trial court has the discretion to determine which factors to consider and how to weigh them.

6. In determining whether a defendant has a meritorious defense, the trial court should consider whether the affidavit contains evidence that (1) the plaintiff cannot prove, or defendant can disprove, an element of the claim or a statutory requirement; (2) a ground for summary disposition exists under MCR 2.116(C)(2), (3), (5), (6), (7), or (8); or (3) the plaintiff's claim rests on evidence that is inadmissible. This list is not exhaustive or exclusive, and the trial court has the discretion to determine which factors to consider and how to weigh them.

Reversed and remanded.

O'CONNELL, J., concurring, wrote separately to advocate that, in order to reduce the element of gamesmanship in the legal process, courts consider the totality of the circumstances when deciding

whether to grant a motion to set aside a default judgment, and to emphasize that the court rules are not a "procedural tightrope" on which a litigant must perfectly balance to avoid being thrown out of court.

1. JUDGMENTS — DEFAULT JUDGMENTS — MOTION TO SET ASIDE — INSURER'S NEGLIGENCE.

The negligence of an insurer or its intermediaries should not be presumptively imputed to an insured, procedurally nonnegligent defendant to preclude a finding of good cause and excusable neglect in connection with a motion to set aside a default judgment (MCR 2.603[D][1]).

2. JUDGMENTS — DEFAULT JUDGMENTS — MOTION TO SET ASIDE — GOOD CAUSE.

In determining whether a party has established good cause to justify setting aside a default judgment, the trial court should consider the totality of the circumstances, which may include the following factors: whether the party completely failed to respond or simply missed the deadline to file; if the party simply missed the deadline to file, how long after the deadline the filing occurred; the duration between entry of the default judgment and the filing of the motion to set aside the judgment; whether there was defective process or notice; the circumstances behind the failure to file or file timely; whether the failure was knowing or intentional; the size of the judgment and the amount of costs due under MCR 2.603(D)(4); whether the default judgment results in an ongoing liability; and, if an insurer is involved, whether internal policies of the company were followed (MCR 2.603[D][1]).

3. JUDGMENTS — DEFAULT JUDGMENTS — MOTION TO SET ASIDE — MERITORIOUS DEFENSE.

In determining whether a defendant has a meritorious defense in connection with a motion to set aside a default judgment, the trial court should consider whether the affidavit contains evidence that the plaintiff cannot prove, or defendant can disprove, an element of the claim or a statutory requirement; a ground for summary disposition exists under MCR 2.116(C)(2), (3), (5), (6), (7), or (8); or the plaintiff's claim rests on evidence that is inadmissible (MCR 2.603[D][1]).

*Hurlburt, Tsiros & Allweil, PC* (by *Lawrence A. Hurlburt*), for the plaintiffs.

*Cardelli, Lanfear & Buikema, PC* (by *Anthony F. Caffrey, III*), for the defendant.

Before: Wilder, P.J., and O'Connell and Whitbeck, JJ.

Per Curiam. Defendant Spence Brothers, Inc., appeals by leave granted the trial court's order denying its motion to set aside a default in favor of plaintiffs James Shawl (Shawl) and Mary Shawl. On appeal, Spence Brothers argues that the trial court erred as a matter of law by applying the wrong standard in denying its motion to set aside the default. In addition, Spence Brothers argues that the trial court abused its discretion in refusing to set aside the default. We reverse and remand.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Boice Bird and Sons, Inc., employed Shawl as a journeyman painter. Spence Brothers hired Boice as a subcontractor to perform painting work on the Saginaw County Event Center, and in late June 2003, Boice assigned Shawl to work at the Event Center. While painting the lobby area of the Event Center, Shawl was injured. Specifically, according to Shawl, while he was painting a wall in the lobby, a temporary electrical panel fell toward him and struck him in the back. As a result, according to Shawl, three screws projecting from the rear of the panel punctured his "lumbar spine."

After the accident, Shawl sued Spence Brothers and J. Ranck Electric, Inc. Shawl's suit alleged that Ranck Electric was negligent by failing to brace safely or attach the electrical panel to the wall and that Spence Brothers, as the general contractor, was negligent for failing to ensure that reasonable steps were taken to guard against the danger that Ranck Electric created.

After being served with Shawl's complaint, Spence Brothers forwarded the complaint to its insurer, Amerisure. Amerisure began processing the complaint, but

while examining coverage issues as part of the process, Amerisure determined that it needed more time to answer the complaint. Accordingly, in early July 2006, Annette Rigdins, an Amerisure senior claims representative, contacted Shawl's attorney and asked for a 30-day extension. Shawl's attorney agreed to the extension and asked Rigdins to "put it in writing." Rigdins then wrote a letter to Shawl's attorney that stated that the new due date for answering the complaint was August 8, 2006.

Spence Brothers failed to answer Shawl's complaint by August 8, 2006. As a result, the trial court entered a default against Spence Brothers on August 16, 2006, pursuant to MCR 2.603(A)(1).

Spence Brothers moved to set aside the default under MCR 2.603(D)(1). Spence Brothers argued that the 30-day extension was from the original due date of the answer, July 14, 2006, which, according to Spence Brothers, would have allowed it to answer through the end of the day on August 14, 2006. However, no answer was filed on that date either. Therefore, the trial court denied the motion. Spence Brothers moved for reconsideration, but the trial court also denied that motion. Spence Brothers now appeals.

## II. "GOOD FAITH" VERSUS "GOOD CAUSE"

### A. STANDARD OF REVIEW

Spence Brothers argues that the trial court did not apply the MCR 2.603(D)(1) criteria when it considered whether to set aside the default. More specifically, Spence Brothers argues that the trial court erroneously refused to analyze the matter to determine whether there was good cause and a meritorious defense as MCR 2.603(D)(1) requires.

With respect to our review of this argument, Spence Brothers relies on *Colista v Thomas*[1] to support its assertion that we should apply a de novo standard of review to determine whether the trial court used the appropriate standard under MCR 2.603(D)(1). In *Colista*, this Court stated that the "interpretation and application of the court rules, like the interpretation of statutes, is a question of law that is reviewed de novo on appeal."[2] However, because the trial court here ultimately explained its use of MCR 2.603(D)(1) and, thus, applied the proper standard, the interpretation and application of the rule are not truly at issue in this case. Therefore, the proper standard of review is the abuse of discretion standard, which applies to review of a trial court's decision on a motion to set aside a default.[3] We also review a trial court's decision to deny a motion for reconsideration for an abuse of discretion.[4]

### B. THE WORDING OF THE COURT RULE

MCR 2.603(D)(1), which governs motions to set aside a default, provides: "A motion to set aside a default or a default judgment, except when grounded on lack of jurisdiction over the defendant, shall be granted *only if good cause* is shown *and* an affidavit of facts showing a *meritorious defense* is filed." (Emphasis added.)

### C. THE TRIAL COURT'S DECISION

Spence Brothers argues that the trial court applied the wrong legal standard under MCR 2.603(D)(1) be-

---

[1] *Colista v Thomas*, 241 Mich App 529; 616 NW2d 249 (2000).

[2] *Id.* at 535.

[3] *Koy v Koy*, 274 Mich App 653, 657; 735 NW2d 655 (2007).

[4] *Churchman v Rickerson*, 240 Mich App 223, 233; 611 NW2d 333 (2000).

cause the trial court never spoke explicitly about "good cause" or a "meritorious defense" at the original hearing on the motion to set aside the default. However, the trial court later provided a fuller explanation in considering Spence Brothers' motion to reconsider the motion to set aside the default.

In response to Spence Brothers' concern that the wrong standard was used, the trial court stated:

> Going back to [MCR] 2.603(D)(1), I was not very artful in saying that I thought that because of this exchange of letters there was not good cause shown. That's what I meant to—I think that's the proper standard and not whether they acted in good faith.

In addition, the trial court stated:

> [I]t's important to the rights of your clients that they have a full hearing, and certainly my words were not as required by the court rules and they were entitled to get a little more definitive response I think as to why I ruled to deny the motion.

The trial court then went on to deny Spence Brothers' motion to reconsider and stated:

> I'll deny the motion for reconsideration under MCR 2.603(D)(1) on the basis that the good cause has not been shown. That's primarily why I think this case is—is easy, and I think plaintiffs' authorities correctly cite that the public policy of the state is in favor of not setting aside defaults indeed without not only good cause but a meritorious defense.

In this regard, the trial court essentially sought to remedy any ambiguity in its prior ruling to deny the motion to set aside the default. In addition, the trial court explained that the reference to "good faith" from the original hearing was merely to say that Shawl did not act in bad faith. In this regard, the trial court stated:

> In this case, quite the contrary. [Shawl] requested the letter [from the insurance adjuster] to foreclose any possibility of confusion or mistake [in regard to the 30-day extension].

Thus, the trial court was simply stating that Shawl acted in good faith and that Spence Brothers did not show good cause to set aside the default.

Even though the trial court may have originally referred to a good faith standard, ultimately the trial court used the correct standard under MCR 2.603(D)(1). Accordingly, Spence Brothers has not shown an abuse of discretion with regard to this issue because the trial court, in fact, used the proper standard.

### III. APPLYING MCR 2.603(D)(1)

#### A. STANDARD OF REVIEW

Spence Brothers argues that it demonstrated good cause based on procedural irregularities and genuine confusion in the proceedings below. Spence Brothers further argues that it has a meritorious defense that will extinguish liability and that a lesser showing of good cause will suffice where a meritorious defense is strong.

As noted, we review a trial court's decision on a motion to set aside a default for an abuse of discretion.[5] Indeed, a trial court's decision in this regard should only be reversed on appeal when there is a *clear* abuse of that discretion.[6] "An abuse of discretion involves far more than a difference in judicial opinion."[7] "Rather, an

---

[5] *Koy, supra* at 657.

[6] *Amco Builders & Developers, Inc v Team Ace Joint Venture*, 469 Mich 90, 94-95; 666 NW2d 623 (2003).

[7] *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 227; 600 NW2d 638 (1999).

abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes."[8] "Moreover, although the law favors the determination of claims on the merits, it has also been said that the policy of this state is generally against setting aside defaults and default judgments that have been properly entered."[9]

### B. GOOD CAUSE

"Good cause" can be shown by: " ' " (1) a substantial defect or irregularity in the proceedings upon which the default was based, (2) a reasonable excuse for failure to comply with the requirements which created the default, or (3) some other reason showing that manifest injustice would result from permitting the default to stand." ' "[10] Spence Brothers argues that the complex nature of this matter ultimately led to the confusion between it and Amerisure that caused the answer to be late, which constituted good cause. We disagree.

### (1) PROCEDURAL DEFECT OR IRREGULARITY

There was, and is, considerable dispute about the exact date the answer to the complaint was due. Under MCR 2.108(A)(1), Spence Brothers had 21 days to answer after being served with the complaint on June 23, 2006. However, as noted earlier, Shawl's attorney and Amerisure agreed on a 30-day extension, which Shawl contends ran from the date on which Amerisure asked for

---

[8] *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

[9] *Alken-Ziegler*, *supra* at 229 (citation omitted).

[10] *Levitt v Kacy Mfg Co*, 142 Mich App 603, 608; 370 NW2d 4 (1985), quoting *Bigelow v Walraven*, 392 Mich 566, 576 n 15; 221 NW 2d 328 (1974), quoting 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 662.

the extension. Shawl points to the written confirmation stating that the new deadline was August 8, 2006. Despite the letter, Spence Brothers contends that the new deadline was intended to be 30 days from the original deadline to answer, which was July 14, 2006.

We conclude that the letter stating the August 8, 2006, date unequivocally set forth the intended expiration of the agreed-upon extension. However, even assuming that the 30-day extension ran from the original deadline to answer, Spence Brothers failed to answer in the time allowed. Thirty days from July 14, 2006, was Sunday, August 13, 2006. Because August 13 was a Sunday, Spence Brothers actually would have had until the end of Monday, August 14, 2006, to answer the complaint.[11] Regardless, Spence Brothers *still* failed to file an answer within the time allocated. Thus, we conclude that no procedural defect or irregularity was present to support a finding of good cause.

### (2) REASONABLE EXCUSE

We next turn to the second factor of the "good cause" test: " ' "a reasonable excuse for failure to comply with the requirements which created the default." ' "[12] With respect to this factor, we initially conclude that Spence Brothers' default was clearly caused by Amerisure's

---

[11] MCR 1.108(1) states:

The day of the act, event, or default after which the designated period of time begins to run is not included. The last day of the period is included, unless it is a Saturday, Sunday, legal holiday, or holiday on which the court is closed pursuant to court order; in that event the period runs until the end of the next day that is not a Saturday, Sunday, legal holiday, or holiday on which the court is closed pursuant to court order.

[12] *Levitt, supra* at 608, quoting *Bigelow, supra*, quoting *Honigman, supra.*

negligence in failing to answer the complaint. There is no dispute that Amerisure's agent knew of, and indeed established, the August 8, 2006, deadline. And, again, even assuming there was some confusion that may have led Amerisure to believe it had until August 14 to file the answer, it has offered no reasonable excuse to explain its ultimate failure to respond. The salient question, however, is whether Amerisure's negligence should be imputed to Spence Brothers.

### (a) CONFLICTING CASES

There is, we believe, a conflict in the pre-November 1990 published opinions[13] of this Court regarding whether to impute the negligence of an insurance company to a defendant.

### (i) WALTERS

We start with *Walters v Arenac Circuit Judge*. There, Justice O'HARA, joined by Justices DETHMERS and KELLY, stated, "It is well settled that the negligence of either the attorney or the litigant is not normally grounds for setting aside a default regularly entered."[14] However, in *Walters*, neither the attorney nor the plaintiff was negligent; rather, the culpable negligence was that of the insurer. Under the circumstances, Justice O'HARA reasoned that the insurer's negligence should not be

---

[13] MCR 7.215(J)(1) (stating that, absent subsequent reversal or modification, this Court is bound to follow the precedent established by Court of Appeals decisions issued on or after November 1, 1990).

[14] *Walters v Arenac Circuit Judge*, 377 Mich 37, 46; 138 NW2d 751 (1966) (opinion by O'HARA, J., joined by DETHMERS and KELLY, JJ.). See also *Amco Builders & Developers, Inc, supra* at 96 ("[G]enerally, an attorney's negligence is attributable to that attorney's client[.]").

imputed to the insured, a doctor, and that the circuit court did not abuse its discretion in setting aside the default. More specifically, Justice O'HARA explained:

> The doctor averred he did what any reasonably prudent person would do under the circumstances when he was personally served. He turned the "papers" over to his insurance company. We do not consider him obligated to call daily to see whether the insurer did what it had contracted and accepted a premium to do. We find no neglect on his part disclosed by the record before us.

> The culpable negligence was that of the involved insurer. The question is then whether that negligence of the unnamed defendant liability insurer, should be imputed to and be conclusive upon the defendant doctor.

> We recognize that in the realities of this situation, irrespective of the named defendant, the real defendant, to the extent of the policy provisions, was the insurer. This conclusion is record-supported by the fact that when counsel received the term calendar showing the named doctor-defendant to be in default, he communicated not with the doctor but with his insurer. It seems an inescapable conclusion that the insurer directed the communicating counsel to appear and answer.

> On the merits of the main case, the doctor-defendant may have been blameless beyond question. He may have been in legal dimension answerable. The question is not before us. It has not been meritoriously litigated under our system of determination of that issue.

> The trend of our jurisprudence is toward meritorious determination of issues. The complexities of our economic system placed the named defendant-doctor in the position of having no way to reach trial on the merits because his insurer was negligent. The money judgment, if such resulted, might have to be paid in full or in part by the insurer. Absent doing violence to the rules of the jurisprudential game, we think the doctor should be entitled to his day in court.

> By this holding we would not be understood to dilute the well-settled law of this jurisdiction that the neglect of a personally served defendant, nor that of his counsel, may not ordinarily be grounds for setting aside a default regularly entered.[15]

Accordingly, the lead opinion in *Walters* affirmed the trial court's decision to set aside the default judgment.

However, as noted, only Justices O'HARA, DETHMERS, and KELLY took part in the lead opinion. Justices BLACK and SMITH concurred in the result without providing any supporting rationale,[16] and Chief Justice KAVANAGH, joined by Justices SOURIS and ADAMS, dissented.[17] Thus, *Walters* created no binding precedent because no majority of justices signed the lead opinion.[18]

### (ii) FREEMAN

In *Freeman v Remley*, the defendant in an automobile accident suit sent the summons and complaint to his insurer.[19] The defendant heard nothing else about the case until he received notice of the default judgment. The insurer denied all knowledge of the claim.[20] In denying the defendant's motion to set aside the default judgment, the trial court noted that the defendant "might have had a good and valid defense," but found it significant that "there was at least notice to an agent of the insurer, that the pleadings were properly

---

[15] *Id.* at 46-47 (opinion by O'HARA, J., joined by DETHMERS and KELLY, JJ.) (citations omitted).

[16] *Id.* at 48 (BLACK and SMITH, JJ., concurring).

[17] *Id.* at 48-56 (KAVANAGH, C.J., and SOURIS and ADAMS, JJ., dissenting).

[18] See *Butterworth Hosp v Farm Bureau Ins Co*, 225 Mich App 244, 248; 570 NW2d 304 (1997) (recognizing that a lead opinion of the Michigan Supreme Court signed by only three justices was not binding on this Court).

[19] *Freeman v Remley*, 23 Mich App 441, 443; 178 NW2d 816 (1970).

[20] *Id.* at 444.

served and that an additional letter was sent notifying the insurer of commencement of suit."[21]

On appeal, the defendant contended that the case at hand was "virtually indistinguishable" from *Walters*.[22] However, without directly commenting on the defendant's argument, and while noting that Justice O'HARA's opinion in *Walters* "capture[d] the current trend in the law," the *Freeman* panel concluded without further elucidation that, "given the facts and circumstances here presented," the trial court did not *clearly* abuse its discretion in refusing to set aside the default judgment.[23]

From what we can ascertain from its brief analysis, the *Freeman* panel essentially chose to employ a strict adherence to the abuse of discretion standard of review rather than follow the rationale provided by the lead opinion in *Walters*. We further note that, in concluding that the trial court did not abuse its discretion, the *Freeman* panel cited *Hartman v Roberts-Walby Enterprises, Inc*.[24] However, the significance of that citation is questionable in that the *Hartman* Court declined to reverse the trial court's denial of the defendant's motion to set aside a default because the defendant failed to show a meritorious defense. Yet, in *Freeman*, the trial court recognized that the defendant "might have had a good and valid defense[.]"

*(iii) ASMUS*

In *Asmus v Barrett*, this Court stated that *Freeman* had "ruled by implication that the negligence of an

---

[21] *Id.*

[22] *Id.* at 446.

[23] *Id.* at 446, 448, citing *Walters, supra* at 47 (stating that a trial court's decision on a motion to set aside a judgment should not be disturbed absent a *clear* instance of abuse of discretion).

[24] *Hartman v Roberts-Walby Enterprises, Inc*, 17 Mich App 724, 726; 170 NW2d 292 (1969).

insurer can and would be imputed to the insured," and opined that "[t]o hold otherwise would be to grant insurance companies an automatic right to vacation of all default judgments."[25]

In analyzing the trial court's refusal to set aside the default, the *Asmus* panel assumed, but did not decide, that certain personnel problems at the defendants' insurance company constituted good cause for the defendants' failure to timely answer.[26] Ultimately, however, the *Asmus* panel affirmed the trial court on the ground that the defendants' affidavits did not support a meritorious defense.

#### (iv) LEVITT

In *Levitt v Kacy Mfg Co*, a panel of this Court took a slightly different approach with regard to the issue whether the insurer's negligence should be imputed to the defendant. The Levitts sued Kacy Manufacturing Company under a product liability theory.[27] Kacy then apparently sent the summons and complaint to its insurance broker, which in turn passed them on to an insurance management company. However, the insurance management company's relationship with the insurer had been severed earlier that year. The Levitts then filed a default. Shortly thereafter, the insurance management company notified the Levitts' attorney that the insurer was in receivership and that no work would be completed on the case for another month.[28] Approximately a week later, the Levitts moved for a default judgment. Kacy then moved to set aside the

---

[25] *Asmus v Barrett*, 30 Mich App 570, 574-575; 186 NW2d 819 (1971).

[26] *Id.* at 574.

[27] *Levitt, supra* at 605.

[28] *Id.* at 606.

default, but the trial court denied the motion because, although the affidavit of facts showed a meritorious defense, Kacy had not shown excusable neglect. The trial court then awarded the Levitts a default judgment.

On appeal, the *Levitt* panel cited *Asmus* and stated that "[t]he negligence of an insurer resulting in a default can and will be imputed to the insured."[29] Yet, the panel recognized that "the mere existence of negligence does not prevent a finding of good cause."[30] The *Levitt* panel then reasoned as follows:

> [The trial judge] did not address the specific negligence that occurred in this case but focused on the problem of companies insulating themselves from default procedures by engaging multiple levels of insurance personnel who must handle suit papers. [The trial judge] would seem to require that a defendant send litigation papers which are served on him directly to his insurer or else proceed "at their own peril". We do not believe the specific facts of this case justify the application of such a generalized policy towards this defendant's employment practice.
>
> Apparently, when defendant's insurer went into receivership, its relationship with [the insurance management company] was severed without adequate notice to defendant or the insurance management company. Thus, the suit papers were erroneously sent to [an insurance management company representative], who, before the insurer was placed in receivership, had handled the claims during the prelitigation stage. *We believe that the errors in providing notice and in handling the suit papers, arising out of the unusual problems associated with the insurer's being in receivership, provide a reasonable excuse for defendant's delay in filing an answer to plaintiff's complaint.*[31]

---

[29] *Id.* at 609.

[30] *Id.*, citing *Walters, supra,* and *Asmus, supra* at 574.

[31] *Id.* at 609-610.

In sum, although adopting a general rule that the insurer's negligence in failing to answer will be imputed to a defendant, the *Levitt* panel nevertheless found good cause to set aside the default because of certain special circumstances that constituted a reasonable excuse for Kacy's delay in answering.

### (v) FEDERSPIEL

In *Federspiel v Bourassa*, Larry Federspiel was injured when Gerald Bourassa hit him with his automobile.[32] Federspiel filed a complaint alleging negligence against Bourassa and Marcia Holland, whose employee served Bourassa alcohol before the accident. Bourassa settled with Federspiel. Holland forwarded the summons and complaint to her insurer, who then forwarded the summons and complaint to an insurance broker.[33] The insurer, however, was unaware that the insurance broker had gone out of business a couple months before the summons and complaint were sent.[34] Apparently during the process of the insurance broker's records being moved to another agency, Holland's claim was misplaced. Therefore, counsel was never assigned to timely answer the complaint, and, as a result, the trial court entered a default and default judgment against Holland.[35] Holland moved to set aside the default, and the trial court granted the motion on the basis of excusable neglect and good cause.[36] Federspiel appealed, disputing the trial court's finding that the failure of Holland's insurer to provide her with representation constituted good cause to set aside the default.[37]

---

[32] *Federspiel v Bourassa*, 151 Mich App 656, 658; 391 NW2d 431 (1986).

[33] *Id.* at 658-659, 661.

[34] *Id.* at 661.

[35] *Id.* at 659, 661.

[36] *Id.* at 658, 659.

[37] *Id.* at 660.

The *Federspiel* panel first noted that "Michigan lacks definitive case law on the issue of whether an insurer's or its intermediaries' negligence ought to be imputed to the insured to preclude a finding of 'excusable neglect' and 'good cause.' "[38] The panel then adopted the reasoning employed in *Walters*.[39] The *Federspiel* panel recognized that the split decision in *Walters* was not controlling precedent and that Court of Appeals cases issued after *Walters* "diluted its impact," yet the panel stated that it was nevertheless "impressed with the logic" of the *Walters* "well-reasoned approach to the problem at hand."[40] The *Federspiel* panel therefore concluded that "[t]he insured defendant in the present situation should not be denied her day in court because of the insurer's negligence in processing her claim."[41] The panel also concluded that the insurer's "failure to answer for or defend [Holland] was the culmination of events which amounted to excusable neglect."[42] Finally, the *Federspiel* panel found that manifest injustice would result if the default judgment were permitted to stand, noting that evidence supported a meritorious defense that Bourassa was not actually intoxicated at the time of the accident. Accordingly, the panel affirmed the trial court's decision to set aside the default judgment.[43]

Notably, the *Federspiel* panel distinguished the facts presented from other cases where this Court affirmed denials of motions to set aside default judgments:

---

[38] *Id.* at 661.

[39] *Id.*

[40] *Id.* at 663.

[41] *Id.*

[42] *Id.*

[43] *Id.* at 658, 664.

In *Freeman*, the insurer was reckless in ignoring notice of the suit and this [C]ourt upheld the trial court's exercise of discretion in denying the motion to set aside the default. In both *Asmus* and *Van Haaften* [*v Miller-Davis Co*, 54 Mich App 186; 220 NW2d 752 (1974)], the defendants lacked a meritorious defense, which is not the case here.[44]

### (vi) CONCLUSION

Unfortunately, now 20-plus years after *Federspiel*, Michigan still "lacks definitive case law on the issue of whether an insurer's or its intermediaries' negligence ought to be imputed to the insured to preclude a finding of 'excusable neglect' and 'good cause.' "[45] Given this lack of solid precedent on which to rely, and despite the nonbinding nature of the lead opinion in *Walters*, we, like the *Federspiel* panel, are persuaded by the logic of *Walters*. That case clearly articulates the well-reasoned rule that an insurer's negligence should not be conclusive on the procedurally nonnegligent defendant.[46] A defendant who diligently turns over a case to an ultimately negligent insurer should not be denied his or her day in court. The defendant is not "obligated to call daily to see whether the insurer did what it had contracted and accepted a premium to do."[47]

In following *Walters*, we specifically reject the rule implied by *Freeman*, and later taken up by *Asmus*, that the negligence of the insurer should be presumptively imputed to the defendant. To hold otherwise may result in the unfavorable consequence of denying defendants

---

[44] *Id.* at 663 n 2.

[45] *Id.* at 661.

[46] We distinguish *procedurally* nonnegligent defendants from defendants who are alleged to be negligent with respect to the substance of the plaintiff's claim.

[47] *Walters, supra* at 46.

who "might have had a good and valid defense"[48] a chance at the meritorious determination of the issues. "[T]he law favors the determination of claims on the merits . . . ."[49]

We further believe that employing an analysis like that in *Levitt*, in which the panel found that "unusual problems associated with the insurer's being in receivership" provided a reasonable excuse for the defendant's delay, merely serves to complicate the issue. Whether the insurer's negligence was a mere oversight in failing to meet the filing deadline or whether it is the result of some other complication, the end result is that the nonculpable defendant is unfairly punished for trusting that his or her insurer was doing its job.

We are cognizant of the *Asmus* panel's concern that not to apply a blanket rule imputing the insurer's negligence to the defendant might be viewed as granting "insurance companies an automatic right to vacation of all default judgments."[50] However, our conclusion here that an insurance company's negligence in failing to answer a complaint constitutes a reasonable excuse under the good cause test for setting aside a default does not dilute a defendant's duty to nevertheless show a meritorious defense supported by an affidavit of facts.[51] Indeed, in *Asmus*, despite ostensibly imputing the insurer's negligence to the defendant, the panel nevertheless decided the case on the ground that the defendant did not demonstrate a meritorious defense.

In keeping with *Walters*, we conclude that Amerisure's negligence should not be imputed to Spence

---

[48] *Freeman, supra* at 444.

[49] *Alken-Ziegler, supra* at 229.

[50] *Asmus, supra* at 574-575.

[51] See MCR 2.603(D)(1).

Brothers and that Amerisure's negligence in failing to answer the complaint constituted a reasonable excuse, under the good cause test, to set aside the default.

### (b) COMMUNICATION BETWEEN ATTORNEY AND INSURANCE REPRESENTATIVE

We acknowledge Spence Brothers' argument that Shawl's attorney should not have communicated with Rigdins because she was a "non-lawyer." However, as the trial court stated, "I see no problem with the insurance agent, the person charged contractually with—to act on behalf of the defendant to engage in the extension of time agreements." Indeed, Rigdins was a senior claims representative for Amerisure. Therefore, the trial court did not abuse its discretion in determining that the communication between Rigdins and Shawl's attorney was not a reasonable excuse that showed good cause to set aside the default.

### C. MERITORIOUS DEFENSE

Spence Brothers argues that it presented a meritorious defense under MCR 2.603(D)(1). "[I]f a party states a meritorious defense that would be absolute if proven, a lesser showing of 'good cause' will be required than if the defense were weaker, in order to prevent a manifest injustice."[52] However, as *Alken-Ziegler* makes clear, the good cause and meritorious defense elements of MCR 2.603(D)(1) are not to be blurred; they are "separate requirements."[53] Thus, Spence Brothers must show a meritorious defense to have the default set aside under MCR 2.603(D)(1).

---

[52] *Alken-Ziegler, supra* at 233-234.

[53] *Id.* at 230-231.

In Michigan, as a matter of public policy, the subcontractors on a job site have a duty to ensure the worksite is safe for their employees.[54] Further, a general contractor is not liable for a subcontractor's negligence.[55] However, a general contractor may be found liable if it failed to take "reasonable steps within its supervisory and coordinating authority" to protect workers from "readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen."[56] In what is often referred to as the *Funk* four-part test,

> a plaintiff must show that (1) the defendant, either the property owner or general contractor, failed to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high degree of risk to a significant number of workmen (4) in a common work area.[57]

Spence Brothers argues that it is impossible for Shawl to recover under the *Funk* four-part test. Spence Brothers asserts that its affidavit demonstrates that at least one of the elements under the *Funk* four-part test is missing and, thus, it has presented a meritorious defense. In its affidavit, Spence Brothers stated that "[a]ny danger created by the allegedly faulty electrical panel was not readily observable by Spence Brothers." Spence Brothers also stated, "Any danger created by the allegedly faulty electrical panel presented a danger to

---

[54] See *Hughes v PMG Bldg, Inc*, 227 Mich App 1, 6; 574 NW2d 691 (1997).

[55] *Signs v Detroit Edison Co*, 93 Mich App 626, 632; 287 NW2d 292 (1979).

[56] *Ormsby v Capital Welding, Inc*, 471 Mich 45, 53-54; 684 NW2d 320 (2004), quoting *Funk v Gen Motors Corp*, 392 Mich 91, 104; 220 NW2d 641 (1974), overruled in part on another ground in *Hardy v Monsanto Enviro-Chem Sys, Inc*, 414 Mich 29 (1982).

[57] *Ormsby, supra* at 54.

only a small number of workers since the painting
subcontractor, Boice Bird & Sons, requested that the
electrical panel be made mobile for purposes of their
work." If proven, these assertions might well be a
defense to Shawl's claim. Therefore, we conclude that
Spence Brothers has met its burden by filing an affida-
vit of facts showing a meritorious defense.

### D. MANIFEST INJUSTICE

The Supreme Court has clarified the manifest injus-
tice factor of the "good cause" test as follows:

> The first two prongs of the Honigman & Hawkins "good
> cause" test are unremarkable and accurately reflect our
> decisions. It is the third factor, "manifest injustice," that
> has been problematic. The difficulty has arisen because,
> properly viewed, "manifest injustice" is not a discrete
> occurrence such as a procedural defect or a tardy filing that
> can be assessed independently. Rather, manifest injustice is
> the result that would occur if a default were to be allowed
> to stand where a party has satisfied the "meritorious
> defense" and "good cause" requirements of the court rule.
> When a party puts forth a meritorious defense and then
> attempts to satisfy "good cause" by showing (1) a proce-
> dural irregularity or defect, or (2) a reasonable excuse for
> failure to comply with the requirements that created the
> default, the strength of the defense obviously will affect the
> "good cause" showing that is necessary. In other words, if a
> party states a meritorious defense that would be absolute if
> proven, a lesser showing of "good cause" will be required
> than if the defense were weaker, in order to prevent a
> manifest injustice.[58]

To reiterate, we conclude that Amerisure's negli-
gence should not be imputed to Spence Brothers and
that Amerisure's negligence in failing to answer the
complaint constituted a reasonable excuse under the

---

[58] *Alken-Ziegler, Inc, supra* at 233-234.

good-cause test to set aside the default. We further conclude that Spence Brothers has met its burden by filing an affidavit of facts showing a meritorious defense. Therefore, we conclude that permitting the default to stand, by following a rule that would perfunctorily impute Amerisure's negligence to Spence Brothers, would result in manifest injustice.

### E. TOTALITY OF THE CIRCUMSTANCES

In light of the previously unsettled state of the law on the issue whether an insurer's or its intermediaries' negligence ought to be imputed to the insured to preclude a finding of "excusable neglect" and "good cause," we offer additional guidance for future cases. There are multiple types of cases, both civil and criminal, where caselaw provides factors to the trial courts to weigh and balance before reaching a decision based on the totality of the circumstances.[59] Because the grant or denial of a motion to set aside a default judgment is examined under the same standard of review and is similarly fact-intensive, we believe that it would be helpful to the trial courts if we provided additional factors for them to use in their evaluations of "good cause" and "meritorious defense" under MCR

---

[59] See *Sparks v Sparks*, 440 Mich 141, 158-160; 485 NW2d 893 (1992) (determining alimony is within the trial court's discretion and involves consideration of certain enumerated factors); *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988) (whether a confession is voluntary requires reviewing factors and making a determination on the basis of the totality of the circumstances); *People v Colon*, 233 Mich App 295, 304-305; 591 NW2d 692 (1998) (a suggestive identification procedure is only improper where, after reviewing certain relevant factors, the totality of the circumstances indicates a substantial likelihood of misidentification); *McCain v McCain*, 229 Mich App 123, 124; 580 NW2d 485 (1998) (custody determinations are made on the basis of the best interest of the child in light of the trial court's findings with regard to 12 specific factors).

2.603(D)(1). We emphasize that trial courts should base
the final result on the totality of the circumstances.

We base the need for a "totality of the circumstances"
test in part on the broad elements considered in the
cases discussed earlier and in part on the Michigan
Supreme Court's recognition that although "good
cause" and a "meritorious defense" are separate re-
quirements that may not be blurred and that a party
must have both,[60] there is some interplay between the
two: "[I]f a party states a meritorious defense that
would be absolute if proven, a lesser showing of 'good
cause' will be required than if the defense were weaker,
in order to prevent a manifest injustice."[61] With an
already existing relationship between the two require-
ments, we believe that balancing these factors to come
up with an overall assessment under the totality of the
circumstances provides a better, more easily applied
rule because it supplies a flexibility that takes into
consideration the variable, fact-intensive nature of de-
fault cases, avoiding bright-line distinctions that fail to
balance the dueling public policy issues of having cases
decided on the merits and not setting aside properly
entered default judgments. With respect to the present
facts, such a test avoids the two extremes of automati-
cally imputing an insurer's negligence to a defendant or
automatically giving the insurer a free pass to void any
default judgment.

To reiterate, the following lists are intended to pro-
vide guidance to the trial courts in determining
whether a party has shown "good cause" and a "meri-
torious defense" under MCR 2.603(D)(1) such that
setting aside a default judgment is proper under the
totality of the circumstances.

---

[60] *Alken-Ziegler, Inc, supra* at 230-231, 233-234.

[61] *Id.* at 233-234.

In determining whether a party has shown good cause, the trial court should consider the following factors:

(1) whether the party completely failed to respond or simply missed the deadline to file;

(2) if the party simply missed the deadline to file, how long after the deadline the filing occurred;

(3) the duration between entry of the default judgment and the filing of the motion to set aside the judgment;

(4) whether there was defective process or notice;

(5) the circumstances behind the failure to file or file timely;

(6) whether the failure was knowing or intentional;

(7) the size of the judgment and the amount of costs due under MCR 2.603(D)(4);[62]

(8) whether the default judgment results in an ongoing liability (as with paternity or child support); and

(9) if an insurer is involved, whether internal policies of the company were followed.

In determining whether a defendant has a meritorious defense, the trial court should consider whether the affidavit contains evidence that:

(1) the plaintiff cannot prove or defendant can disprove an element of the claim or a statutory requirement;

(2) a ground for summary disposition exists under MCR 2.116(C)(2), (3), (5), (6), (7) or (8); or

(3) the plaintiff's claim rests on evidence that is inadmissible.

---

[62] For example, it seems illogical to set aside a default judgment where the amount of fees and costs to be awarded under MCR 2.603(D)(4) will be greater than or roughly equal to the amount of the default judgment, as the defendant will pay the same amount, whether in costs if the judgment is set aside or under the judgment if it is not.

Neither of these lists is intended to be exhaustive or exclusive. Additionally, as with the factors provided in other contexts, the trial court should consider only relevant factors, and it is within the trial court's discretion to determine how much weight any single factor should receive.[63]

We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

O'CONNELL, J. (*concurring*). I concur with the majority opinion that the trial court, when deciding whether to grant or deny a motion to set aside a default judgment, must examine the totality of the circumstances. I also join in the majority's conclusion to reverse the trial court's decision. I write separately to advocate the totality of the circumstances test and to emphasize that the Michigan Court Rules are not "a procedural tightrope upon which a litigant must balance carefully and perfectly" or be thrown out of court. *Gering v Anderson Villas, LLC*, unpublished opinion per curiam of the Court of Appeals, issued May 13, 2008 (Docket No. 275940), at 3.

At the outset, I stress that this opinion is not intended as an analysis or criticism of either the trial court or the majority's methodology in resolving this case, but as an opportunity to address and reduce the gamesmanship that creates hostile attitudes and fric-

---

[63] See *Sparks, supra* at 159-160 (in determining alimony, the trial court determines what factors are significant and how much weight to assign to each factor; the factors listed are not exclusive); *Cipriano, supra* at 334-335 (no single factor is conclusive of the issue); *People v Kachar*, 400 Mich 78, 93-94, 97; 252 NW2d 807 (1977) (factors used to determine whether an independent basis for an in-court identification exists are not inclusive or exclusive and the weight given to each is within the trial court's discretion); *McCain, supra* at 131 (a trial court need not give equal weight to all the best-interest factors in child custody decisions).

tion among litigants, lawyers, and the bench. Some attorneys maintain that gamesmanship is a fundamental and ingrained aspect of the legal process, and that attempts to compete with or outdo their opponents are not only appropriate but also required for zealous advocacy. I contend, however, that this gamesmanship attitude, which is all too prevalent in today's law practice, is more destructive than helpful, because it brings disrespect upon the law, the litigants, and our shared concept of justice. Although I have no illusions that the game theory of law practice will be eliminated, I remain hopeful that this gamesmanship can be reduced through the application of the totality of the circumstances test to the process of administering justice. Indeed, one purpose of this opinion is to ignite discussion on the topic.

I begin with the proposition that the litigation process is best described as "conflict within a set of rules." Stated another way, lawsuits generally involve a disagreement between conflicting parties, and the Michigan Court Rules provide a set of rules designed to help resolve this conflict. Consequently, a judge's role is to resolve the conflict within the strictures of the Michigan Court Rules. These rules are designed to create consistency and a level playing field for all participants in the dispute resolution process.

The law favors the determination of claims on their merits. *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 229; 600 NW2d 638 (1999). Dismissals and defaults are the system's mechanism for sanctioning those whose conduct does not fall within the confines of the rules. See MCR 2.504(B)(1); MCR 2.313(B)(2)(c); *Mink v Masters*, 204 Mich App 242, 243-245; 514 NW2d 235 (1994). Litigants who purposefully and repeatedly act outside the scope of, or fail to

follow clear and concise, rules deserve special and prompt attention from the court. However, if a timely meritorious claim or defense is alleged and the conflict of the parties reasonably falls within the set of rules at issue, the law favors a lesser sanction than default or dismissal. See MCR 2.603(D)(1). But not all cases are meritorious and not all defenses are worth pursuing, particularly if the costs of litigation exceed the benefits or burdens to the parties. That is why, in my opinion, the best manner in which to balance these issues and reach a fair and just decision is to weigh the totality of the circumstances.

Every case is different, with factual nuances that must be identified, evaluated, and balanced to reach a proper result. Only an experienced judge with common sense, wisdom, and a sense of justice is empowered by our constitution to make the correct decision. It is the judge who also exercises patience that generally uses the correct process. However, a judge who focuses solely on a *single* process, to the exclusion of all else, sometimes experiences methodological tunnel vision.[1] The process then becomes perfunctory and often results in unjust, illogical, and incongruous outcomes.

I find this occurs most often where, as in this case, "procedure is substance." The merits of the case are left in the wake created by the procedural rules. In such

---

[1] The reader may interpret this statement as a criticism of textualism. It is not. In my opinion, all good judges begin the resolution of a controversy with the text of the statute or court rule. A principled decision with a principled outcome is the goal of any decision-making process. I use this language only in the sense that the practical constraints involved in drafting court rules impose what may occasionally resemble methodological tunnel vision. Good judges will have the common sense and wisdom to integrate, where necessary, the rules, the comments to the rules, and caselaw into a fully articulated and intellectual framework.

cases, the manner in which the procedural rules are implemented can be more important than the substance of the case. The journey becomes more important than the destination. The totality of the circumstances test is an attempt to distinguish those occasions when the bright-line application of the rules is appropriate (such as dismissal for failure to file within the statute of limitations) with situations where the rules themselves involve abstract concepts of justice (as with the use of the term "good cause" in the default judgment context). In the latter case, the art of judging cannot become a mechanical or computer-like process.

Indeed, both this Court and our Supreme Court have dismissed the notion of judging as a mechanical process. " '[Rules of practice and procedure] must be followed but they must also be thought of as guides and standards to the means of achieving justice, not the end of justice itself.' " *Higgins v Henry Ford Hosp*, 384 Mich 633, 637; 186 NW2d 336 (1971),[2] cited with approval in *People v Grove*, 455 Mich 439, 469-470 n 36; 566 NW2d 547 (1997). "Judging is an art," and the role of a judge is not that of a computer plugging facts into a formula and spitting out results. *Nippa v Botsford Gen Hosp (On Remand)*, 257 Mich App 387, 393-394 n 5; 668 NW2d 628 (2003). Indeed, the very nature of the rules con-

---

[2] The quotation comes from the official committee comment to GCR 1963, 13 (replaced in 1985 with MCR 1.105) and reads in full:

"Rules of practice and procedure are exactly that. They should create no rights and should be thought of as indicating the way in which justice should be administered. They should give direction to the process of administering justice *but their application should not become a fetish to the extent that justice in an individual case is not done*. There is a need for guides and standards. They must be followed but they must always be thought of as *guides and standards to the means of achieving justice, not the end of justice itself*." [*Higgins, supra* at 637.]

firms that "[n]o computer will ever be able to replace the role of judge in our society, and no computer or mechanical device can function at the level of a judge." *Id.* at 393 n 5. MCR 1.105 provides that a trial court should construe the rules "to secure the just, speedy, and economical determination of every action and to avoid the consequences of error that does not affect the substantial rights of the parties." Computers input data and spit out results. They cannot comprehend, let alone administer, something as non-formulaic as justice.

Accordingly, I conclude that a decision to set aside a default judgment must be based on the totality of the circumstances and an individualized assessment of the facts and conditions of the specific case. Because the majority opinion takes this position into account and, because under the totality of the circumstances test the trial court erred in failing to set aside the default judgment, I concur in the result reached by the majority opinion.